# EXHIBIT

# 2

D:\PrintImageBundler\Temp\681750\Originals\20170425141300702.PDF

FILED

STATE OF NORTH CAROLINA 2017 APR 19 PM 4:47 IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG 17-CVS-6054

MECKLENBURG CO..C.S.S.

BY _____

TARA RAGAN,

        Plaintiff,

v.

MECKLENBURG EMS AGENCY d/b/a
MEDIC,

        Defendant.

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff Tara Ragan ("Ragan" or "Plaintiff"), complaining of Defendant Mecklenburg EMS Agency d/b/a MEDIC ("MEDIC" or "Defendant"), and alleges as follows:

## PARTIES

1. Plaintiff is an adult citizen and resident of Davidson, Mecklenburg County, North Carolina.

2. Upon information and belief, Defendant is a joint government agency formed through an agreement between Mecklenburg County and the Charlotte-Mecklenburg Hospital Authority, and is independently operated under Mecklenburg County, pursuant to N.C. Gen. Stat. § 160A-460 *et seq*.

3. Defendant maintains and administers a 9-1-1 Emergency Medical Services ("EMS") agency.

4. Defendant's principal place of business is in Charlotte, Mecklenburg County, North Carolina.

1

Case 3:17-cv-00489-RJC-DCK   Document 1-2   Filed 08/15/17   Page 2 of 37

5.     Plaintiff received her compensation from Defendant and Defendant issued Plaintiff's W-2 for her income for all years relevant to this action.

6.     Defendant is an employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.1, *et seq.*

7.     Upon information and belief, at all relevant times Defendant had a liability insurance policy which covers the state law claims alleged in this Complaint and, therefore, Defendant has waived any defense of governmental immunity.

## JURISDICTION AND VENUE

8.     The unlawful employment practices alleged in this complaint took place in Mecklenburg County, North Carolina.

9.     Jurisdiction and venue are proper in this Court pursuant to N.C. Gen. Stat. §§ 1-75.4 and 1-79 and 29 U.S.C. § 2617(a)(2).

## ADMINISTRATIVE PROCEDURES

10.     Plaintiff timely filed a Charge of Discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC") on or about June 10, 2015, and the EEOC received the Charge on or about June 25, 2015.

11.     On December 30, 2016, the EEOC issued a "Notice of Right to Sue" entitling Plaintiff to commence this action within ninety (90) days of her receipt of that notice, which Plaintiff received on or about January 10, 2017.

12.     Plaintiff timely filed an Application and Order Extending Time to File Complaint on March 30, 2017.

13.     Plaintiff now timely files her Complaint commencing this action.

2

14.    Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## INTRODUCTION AND NATURE OF ACTION

15.    Plaintiff, a former employee of MEDIC, brings this action against Defendant for gender discrimination, racial discrimination, wrongful termination, hostile work environment, and retaliation in violation of Title VII and for wrongful discharge in violation of the North Carolina public policies expressed in NCEEPA, and seeks compensatory damages.

## BACKGROUND

16.    Plaintiff began working at MEDIC as the Public Relations Manager on December 3, 2013.

17.    Plaintiff reported to Deputy Director Jeff Keith ("Keith"), who in turn reported to Executive Director Josef "Joe" Penner ("Penner").

18.    Plaintiff had two direct reports: Tiffany Archibald ("Archibald") and Lester Oliva ("Oliva"). Upon information and belief, Archibald is a black female and Oliva identifies himself as a Hispanic or Latino male.

19.    Oliva was Plaintiff's direct report starting from the time Plaintiff was hired.

20.    Archibald was Plaintiff's direct report starting around July 2014, when she was hired. Archibald replaced a former MEDIC employee, Nikki Perry ("Perry"), who resigned. Upon information and belief, Perry is a black female.

21.    Perry told Plaintiff that the reason she was leaving MEDIC in July 2014 was that she could no longer handle the demeaning way that Keith treated her in contrast to her peers who were not minorities or females. Perry explained that Keith treated her like she was less than her

3

peers; that she was not offered the same professional opportunities as her colleagues at MEDIC; and that Keith was discriminating against her because she is a black female.

22.     Upon information and belief, Penner and the Executive Leadership Team oversee MEDIC's day-to-day operations.

23.     Upon information and belief, Keith and Penner have been close friends and coworkers for several years.

24.     Upon information and belief, Penner has also been close friends with outside legal counsel for MEDIC for many years.

25.     Upon information and belief, Keith and Penner are white males and have been members of MEDIC's Executive Leadership Team for many years.

26.     The white male members of MEDIC's Executive Leadership Team, including Keith and Penner, exhibited inappropriate, hostile, and sexist behaviors towards Plaintiff as well as racist and sexist behaviors toward female and minority employees, respectively.

27.     For example, upon information and belief, Penner told a female employee that she should be "sticking to the vegetables," insinuating that she was overweight and therefore unattractive, but does not make similar comments to men about their appearance and weight.

28.     Upon information and belief, female employees told Plaintiff that they stopped wearing dresses to work to downplay gender differences and to avoid unwelcome commentary' from male employees.  Moreover, coworkers have told Plaintiff that Keith does not like smart, competent women.

29.     Upon information and belief, MEDIC has an organizational culture that supports a consistent pattern of subjecting females and other minority employees to discrimination in violation Title VII and  in violation of NCEEPA; employees are treated disparately and less

4

favorably in the terms and conditions of their employment based on race, color, sex, and national origin.

30.     Upon information and belief, there is a known culture of fear that anyone who complains about or opposes unlawful discrimination, disparate treatment, or harassment will likely be subjected to a hostile work environment and retaliation.

31.     During her employment, Plaintiff regularly discussed with Sharon Taulbert ("Taulbert"), the Human Resources ("HR") Manager, her concerns about discrimination, disparate treatment, and harassment based on race, color, sex, and national origin in the workplace and the culture of fear and retaliation.

32.     Plaintiff opposed these unlawful employment practices committed by members of MEDIC's Executive Leadership Team, including Keith and Penner. HR Manager Taulbert acknowledged these issues, including their severity and pervasiveness, but told Plaintiff that she was "not empowered to do anything" about it. Upon information and belief, Taulbert became increasingly frustrated as she learned she did not have the power to handle and resolve complaints beyond the supervisor level.

33.     In March 2014, during a Management Team workshop, Plaintiff was placed in a breakout group with four males including Keith. The workshop leader told the groups to pick a note taker, and Keith turned to Plaintiff and said, "Well, if we need a note taker, guess that would be your job."

34.     The three other males and Plaintiff all understood Keith to mean that she should take notes because she was the only woman, and this was women's work. The other males pointed out that the remark was inappropriate/offensive, but Keith compounded the problem by laughing it off with a shrug and saying "oh, well...."

5

35.     In September 2014, Plaintiff and Archibald met with Jon Studnek ("Studnek") and Keith.  Plaintiff realized she did not bring to the meeting enough copies of the materials for everyone present and said she would go make the required copies.  Later, Studnek and Archibald each separately told Plaintiff that Keith had then said to Archibald, "That's *your* job to make the copies," implying that she should do the menial work because she was the only black female among the group and should have done this administrative task, although Archibald was not Plaintiff's administrative assistant.

36.     Archibald complained to Plaintiff that she was offended by Keith's remark, which she found to be racist and sexist.  Plaintiff asked if Archibald would like to speak with HR Manager Taulbert to discuss her complaint.  Archibald said she would not because she feared retaliation since Keith would know it was her who complained.

37.     Studnek separately approached Plaintiff to say that he also found the comment offensive, but was afraid to confront Keith about it.

38.     On or about December 17, 2014, Plaintiff attended a Management Team Strategic Planning workshop along with Executive Director Penner, all the Deputy Directors, and the Management Team.  In a breakout group that included Keith, Plaintiff, and four other women including one black female, Keith said, "I am either sexist or racist; I'll let you figure out which one, I'm not going to change."

39.     Upon information and belief, Melissa Garifo reported Keith's comment to HR Manager Taulbert; Shari Lambeth ("Lambeth") and another female employee confirmed the incident.

40.     Upon information and belief, Lambeth went on to report Keith's comment to the entire Executive Leadership Team during a meeting; Lambeth had been trying to explain that

6

diversity and inclusion needed to be part of MEDIC's strategic objectives, but Penner was not supportive of that idea presented by her. Lambeth then reported Keith's comment to counter Penner's opposition by demonstrating that a Deputy Director felt comfortable making such an offensive remark. Upon further information and belief, Penner responded with hostility and by reprimanding Lambeth for her reporting instead of reprimanding Keith for his inappropriate comment.

41.     On or about January 26, 2015, Keith emailed Plaintiff asking her to have Oliva, her direct report, organize a community engagement event for a group of Boy Scouts. Oliva was responsible for managing these events. The event, a bicycle safety demonstration, was scheduled for February 2, 2015.

42.     Oliva was not able to secure the needed field staff to work the event as their department had suspended sign-ups for these types of events pursuant to Keith's instructions emailed on September 24, 2014 limiting work on community engagement projects. Keith had changed the protocol for community engagements due to staffing issues and emergency call volume.

43.     When Plaintiff told Keith that Oliva had been following Keith's protocol from September 24, 2014, Keith's face grew red and he yelled "I never said that! I don't know where you people got that idea, but I never said that!" Upon information and belief, Keith had this tirade despite his knowledge of his prior written instructions.

44.     Keith falsely accused Oliva, a Hispanic male, of lying, not performing his job duties, and being incapable of doing his job. When Plaintiff explained to Keith that Oliva was just following Keith's written directions, Keith accused her of lying as well.

7

D:\PrintImageBundler\Temp\681750\Originals\20170425141300702.PDF

45.     Plaintiff showed Keith the September 24, 2014 email he had written, showing that he changed the protocol for community engagements, that they were not lying, and that their actions were supported by his instructions. Upon information and belief, Keith treated this as a challenge from a subordinate female. Keith responded with increased hostility and aggressiveness.

46.     Keith falsely claimed Plaintiff was not properly managing Oliva, when in fact, Plaintiff and Oliva were following his written protocols.

47.     Over the next couple of days, employees in Plaintiff's department expressed confusion about why Keith was insisting that the Boy Scout troop event take place outside the parameters of his own protocol, and why Keith was so upset. Several employees expressed frustration because a bicycle safety demo for the Boy Scout troop did not seem critical in comparison to other programs that had recently been eliminated by Keith.

48.     Upon information and belief, when Keith changed the event protocol, he eliminated an important health clinic that helped serve the medical needs of the Hispanic/Latin community. At that time, MEDIC employees—including Oliva—lobbied to keep that program, but Keith refused, with Penner's support.

49.     Plaintiff later learned that, upon information and belief, a good friend of Penner's had requested the bicycle safety demo for his son's Boy Scout troop. Upon information and belief, Keith and Penner prioritized their friendships above the needs of the Hispanic/Latin community.

50.     Upon information and belief, Penner even committed one of MEDIC's ambulances to be present at the Boy Scout bicycle demo.

51.     Based on the actions of both Keith and Penner, Plaintiff suspected that they were discriminating against and targeting Oliva because he is Hispanic/Latino, and Plaintiff because she is female.

8

52.     Around this same time, Oliva requested to attend Leadership Charlotte, a leadership training event, and Plaintiff advocated for Oliva to attend. Keith repeatedly denied the request even when Oliva offered to take the course at his own expense.

53.     After this, on January 27, 2015, Plaintiff made a complaint of discrimination and retaliation based on race, color, sex, and national origin, and expressed her concern that she could not effectively shield her direct reports (two minorities, one of whom was female) from discrimination and retaliation by Keith.

54.     Plaintiff told HR Manager Taulbert that Keith was making false statements about her direct report Oliva, a Hispanic male employee, and she was concerned Keith would try to negatively impact Oliva's upcoming performance review, and that Plaintiff thought she had a duty as his supervisor to support him.

55.     Plaintiff and HR Manager Taulbert discussed whether Plaintiff was making an official complaint, and the risks of doing so. Plaintiff told Taulbert that she was making an official complaint of discrimination and retaliation, and asked her how they needed to proceed. During this discussion, Taulbert acknowledged that there were no procedures in place to address discrimination by a manager at Keith's level and acknowledged that Penner and Keith were so intertwined that she did not expect that Penner would take any action to correct Keith's discriminatory and retaliatory attitudes and actions. Taulbert acknowledged that Penner would likely just tell Keith to get everyone "on the same page" and that Keith would then retaliate against both Plaintiff and Oliva. Taulbert said she wanted to discuss the matter with Kevin Staley ("Staley"), one of the other Deputy Directors, but Taulbert also acknowledged that Staley might not be able to help because others in the MEDIC leadership team had pushed him out of the loop—he was not part of the inner-most circle.

9

56.     On or about January 28, 2015, Plaintiff received an email from Keith regarding Oliva's job duties. The email substantially deviated from the job duties that were previously set for Oliva in September 2014, with Keith's participation and direction. Plaintiff had a discussion with Staley and Taulbert and explained she felt things were escalating quickly and that Keith was retaliating against Oliva based on his race, color, and national origin, and against Plaintiff based on her sex and for advocating for Oliva's leadership training opportunities, and because of her willingness to advocate for her direct reports, both of whom were minorities, one of whom was female.

57.     Upon information and belief, Keith was very angry and hostile because Oliva had proven he (Oliva) was not lying and that he had followed Keith's written protocols from September 2014. Keith was reacting as though Plaintiff (a woman) and Oliva (a Hispanic male) were trying to challenge him when they were just trying to do their jobs as Keith had instructed.

58.     Staley told Plaintiff her concerns were important and serious, and needed to be addressed. Plaintiff told Staley she was worried he could be putting his job at risk if he supported Plaintiff, due to the corporate culture of retaliation at MEDIC.

59.     Later that afternoon, on or about January 28, 2015, Plaintiff attended a Manager's Meeting. This group does not include the Director and Deputy Directors who make up the Executive Leadership Team. ˙ Plaintiff openly expressed her concerns about diversity, discrimination, and retaliation at MEDIC. There were twelve (12) managers present at this meeting. There was a consensus among them that a culture of discrimination, harassment, and retaliation existed at MEDIC that needed to be addressed, particularly because MEDIC is a public service agency. These managers pointed out that HR is not empowered to take any action beyond the supervisor level, and has no power over the Director or Deputy Directors. HR Manager

10

Taulbert was present during the meeting and agreed she did not feel empowered to deal with complaints or issues such as sexual harassment, discrimination, and diversity beyond the supervisor level.

60. Taulbert explained to Plaintiff that when she first came to MEDIC, she did not think there were any issues with discrimination since no formal complaints had been raised in the beginning. She explained further that this changed as employees began to trust her; they shared more information, and she discovered there were a lot of issues related to discrimination. Taulbert acknowledged that employees were consistently afraid to make formal complaints out of fear of retaliation.

61. After the January 28, 2015 meeting, employees who had worked for MEDIC for over 20 years approached Plaintiff and shared their experiences of discrimination and retaliation, as well as their knowledge of discrimination and retaliation against other women throughout their careers with MEDIC. One of these individuals was Melissa Garifo, who no longer works for MEDIC; the other is still employed there. Each of these women warned Plaintiff that she should "watch [her] back" because she would be retaliated against for speaking out about discrimination and retaliation at MEDIC. They said that women who stood up in the past had been pushed out of MEDIC by Keith and Penner; that what Plaintiff said during the Manager's Meeting would get back to Keith and Penner; and that she should start looking for another job because the Directors would come after her quickly.

62. On February 3, 2015, Plaintiff met with Staley and Taulbert, to discuss her complaint. Taulbert said she was still trying to figure out what could be done because if Plaintiff made it an "official complaint," Taulbert and Plaintiff were likely to be retaliated against.

11

Case 3:17-cv-00489-RJC-DCK    Document 1-2    Filed 08/15/17    Page 12 of 37

63.     Plaintiff specifically requested an external investigation because she was aware that, upon information and belief, prior internal investigations were ineffective and resulted in harassment, retaliation, and termination.

64.     Upon information and belief, an outside consultant had previously been contracted to improve diversity issues and increase awareness, but when the consultant reported out and created a plan to address the biases and discriminatory behavior of the Executive Leadership Team, her contract was terminated.

65.     Still, Taulbert and Staley informed Plaintiff that they would lead an internal investigation into the matter.

66.     On or about February 9, 2015, Plaintiff had a conversation with Keith regarding Keith's and Penner's recent decision not to allow Oliva to attend Leadership Charlotte, despite Plaintiff's recommendation that Oliva's request be approved.

67.     Plaintiff had recommended Oliva for Leadership Charlotte because she felt it was appropriate given the nature of his position as Community Engagement Coordinator and his interactions in the community. Plaintiff also felt that Oliva was an appropriate choice because past development opportunities had been offered to white male employees. Plaintiff also knew that money was available in the budget for this purpose. Moreover, Oliva had asked for leadership development opportunities for at least the past three years without ever being provided any such opportunities by MEDIC.

68.     During their conversation, Penner expressed the view that Oliva was not "really the *kind of employee* we want representing MEDIC." Plaintiff understood this reference about Oliva not being the right "kind of employee" to refer to his race and national origin. Plaintiff asked for

12

clarification on what that meant but Penner evaded the question and said: "Come on, I feel like you are trying to make [me] the bad guy here."

69.     Plaintiff was offended by Penner's tone and implications, and explained why Oliva was the right "type" or "kind" of person to attend.

70.     Plaintiff also reminded Penner that Oliva was willing to participate at his own expense and had offered to use his vacation time. This meant that Oliva would attend as an individual and would not be "sponsored by" MEDIC, but Penner would not relent.

71.     On or about February 10, 2015, Keith confronted Plaintiff angrily about going over his head to discuss Oliva's opportunities directly with Penner. Keith acknowledged that Leadership Charlotte was well-aligned with Oliva's job roles and got angry when Plaintiff mentioned that Oliva could turn in the application for Leadership Charlotte on his own. Keith said, "we've got to stop him" and "we can't let that happen." Plaintiff notified Staley that things were escalating with Keith. Plaintiff considered Keith's escalating anger to be irrational.

72.     Plaintiff felt that Keith was asking her to engage in unlawful discrimination by directing her to help him prevent Oliva from applying for this opportunity on the bases of his race, color, and national origin. Plaintiff was extremely uncomfortable with Keith's directive.

73.     Plaintiff refused to participate in unlawful conduct or conduct which violated North Carolina public policy and Title VII. She explained to Keith why she thought Oliva's role was well-aligned with the program. Despite this, Penner and Keith gave conflicting reasons why Oliva should not attend, and would not approve Oliva's application to attend Leadership Charlotte. Plaintiff told Keith that other white males in the front office had been allowed to attend much more expensive development opportunities with the support of Penner and Keith.

13

D:\PrintImageBundler\Temp\681750\Originals\20170425141300702.PDF

74.     During the same February 10, 2015 conversation, Keith also told Plaintiff that he and Penner did not "like" one of the employees who was nominated by her peers at MEDIC for participation in the "Stars of Life" program.

75.     Stars of Life is a national recognition for EMS professionals who excel in knowledge, leadership, and community relationships. Three (3) nominees are sent to a national conference in Washington, D.C. each year. They are peer nominated. There is a Stars of Life Committee led by the Public Relations team, which included two (2) females, one (1) Hispanic male, and one (1) African-American female. The Committee has written parameters to make the process as objective as possible and for tallying nominations.

76.     Plaintiff believed that Keith's and Penner's opposition to this employee's peer nomination was retaliatory because the nominee had previously notified Plaintiff that she was experiencing a hostile work environment, sex discrimination, and management's failure to protect her from workplace threats or inappropriate behavior. The employee had asked Plaintiff for help about serious workplace concerns, and was not a troublemaker. After the employee complained to her male supervisor, he responded by saying she just "wasn't getting laid enough." Upon information and belief, the employee was continually harassed and retaliated against.

77.     Keith told Plaintiff that she and the rest of the Stars of Life Committee should be prepared to defend their choice of nominee to the Executive Leadership Team the next day. Plaintiff reminded Keith that she had a parent/teacher conference at her daughter's school, and said Tony Patillo ("Patillo") could discuss the Stars of Life nomination process with the Executive Leadership Team in her stead. Upon information and belief, Patillo is a black male.

14

78.     Keith refused and said Patillo was "not the right type" to speak in front of the Executive Leadership Team.  Plaintiff believed that Keith's comment referred to Patillo's race, meaning that a white female was preferable to a black male.

79.     When Plaintiff disagreed, Keith said they would just reschedule with the Executive Leadership Team.  Patillo had been on the Committee longer than Plaintiff and was also at the manager level.  Upon information and belief, there was no legitimate, non-discriminatory reason to prevent Patillo from speaking in front of the Executive Leadership Team.

80.     On or about February 11 and 12, 2015, Keith informed Plaintiff that they were reconsidering allowing Oliva to attend Leadership Charlotte.  Plaintiff reminded him that the deadline was February 13, 2015.

81.     On February 13, 2015, Plaintiff reminded Keith again that the deadline was that day.  Keith never got back to Plaintiff, and left early for the day.  No one ever followed up with Plaintiff to indicate whether MEDIC agreed to approve Oliva's application.  Plaintiff reported this to Taulbert and Staley.

82.     Keith confronted Plaintiff on or about February 18, 2015, and pressured her to agree that he would not intentionally do something against her or her direct reports.  She did not agree because she did not have a sufficient basis to believe it was true.  Later that day, Taulbert advised Plaintiff that Keith had relayed their conversation to Staley, one of the other Deputy Directors.

83.     On or about February 19, 2015, Taulbert and Staley advised Plaintiff not to interact in person with Keith, to limit her interaction with him to email, and to copy them on any such emails.  She informed them that this limitation would prove difficult because the majority of her day-to-day work was spent working directly with Keith and he required that she obtain his advance

15

approval on press releases and most other mass communications she sent out. Taulbert and Staley told Plaintiff that a better plan would be in place by the beginning of the following week.

84.     On Friday, February 20, 2015, Staley and Taulbert told Plaintiff to communicate with Keith only by email and to copy them on any emails with him. Plaintiff reminded them that most of her duties involved working directly with Keith, and he required her to get his approval on almost everything she sent out. They again assured her they would come up with a better plan and communicate that to her by Monday, February 23, 2015.

85.     Plaintiff followed Staley's and Taulbert's instructions, but Keith would not respond to her emails, either at all or in a timely manner.

86.     On February 24, 2015, inclement winter weather began to impact the Charlotte area, and the communication restrictions with Keith affected Plaintiff's ability to perform her duties effectively, which included timely communications about inclement weather. Plaintiff asked Taulbert where to report for work during the inclement weather, what the procedure for communicating with Keith would be during the winter storm, and the procedure for communicating with the media during the storm. Each of these questions needed answers only because of Keith's behavior toward Plaintiff and the instruction from Staley and Taulbert that Plaintiff and Keith were to have limited contact.

87.     In addition to the weather concerns, the CIAA tournament was scheduled for the area that same week. On February 25, 2015, Keith questioned Plaintiff's management decisions related to the CIAA events and the upcoming storm even though Plaintiff was following standard procedure.

88.     Keith's behavior was increasingly unsupportive, negative, aggressive, and retaliatory. Keith was not following prior approved procedures and interfered with Plaintiff's

16

ability to get her work done by refusing to respond to her in a timely fashion with information and answers that she needed to perform her duties, and with his negative and hostile manner on routine issues. Plaintiff again asked Staley and Taulbert for assistance, and they said they were working on a solution.

89.     On the same day, Plaintiff sought permission from Staley and Taulbert to engage external help to resolve the situation with Keith so that MEDIC personnel and the public would not be adversely affected further by the limitation in communication and interference imposed on her as well as the underlying harassment, discrimination, and retaliation that were part of the ongoing culture at MEDIC.

90.     Staley and Taulbert reacted very negatively to Plaintiff's request for external help. Later that day, Taulbert told Plaintiff that her only options were to take an involuntary leave of absence or to work from home. Plaintiff told Taulbert she felt these options were unfair and that she felt she was being punished since she was the one who raised complaints of discrimination.

91.     On February 26, 2015, the snow storm hit Charlotte, and Taulbert told Plaintiff to work from home as the roads were closed. A coworker contacted Plaintiff to let her know that Keith called a meeting without inviting Plaintiff, who could have joined by phone, and that Keith had been criticizing Plaintiff in front of her coworkers, in her absence.

92.     Plaintiff began feeling increasingly isolated and powerless in her efforts to improve the working environment. Her coworkers did not know what was going on, and rather than finding a solution, Staley and Taulbert stopped supporting Plaintiff and instead began retaliating against her, treating her as if she was the problem.

93.     Around this same time, MEDIC suddenly started changing previously set goals and parameters for projects Plaintiff was leading, without notice to Plaintiff. In addition, Plaintiff's

17

ideas and solutions were frequently ignored, but when white male colleagues presented those same ideas and solutions as their own to the Executive Leadership Team, even in Plaintiff's original form, the ideas and solutions which originated with Plaintiff were deemed to be good ideas when suggested by white males.

94.     On March 2, 2015, Taulbert again asked Plaintiff take a leave of absence. Taulbert also asked Plaintiff if she told Oliva to record a meeting, and Plaintiff said she had not. Plaintiff told Taulbert she should not be prevented or impeded from doing her job because she raised concerns and made complaints regarding the discriminatory, harassing, and retaliatory work environment.

95.     Taulbert again told Plaintiff to take a leave of absence, and Plaintiff again stated she should not be forced to take leave because she complained of discrimination, harassment, and retaliation. Taulbert informed Plaintiff that she and Staley would conclude their investigation and then report their findings to the Executive Leadership Team. Plaintiff asked Taulbert how that would solve anything since members of the Executive Leadership Team were the reason for Plaintiff's complaints. Taulbert did not have a response.

96.     Plaintiff told Taulbert she did not feel protected after raising concerns of discrimination, harassment, and retaliation, and that the investigation was not being conducted in a way that was conducive to full and frank disclosure by the persons being interviewed. Upon information and belief, the interviews were conducted in Staley's presence without assurances of confidentiality and non-retaliation, and employees were uncomfortable sharing information.

97.     Taulbert told Plaintiff that if employees did not share their true feelings and all the facts, then whatever happened to them was their own fault. Plaintiff questioned the fairness of an investigation controlled by those about whom the complaints were made.

18

98. On March 4, 2015, a female paramedic told Plaintiff that she had been interviewed by Staley and Taulbert; that she made serious complaints of sex discrimination, harassment, and workplace threats by her male work partner, but that HR and management would not allow her to transfer to another work partner. The paramedic was surprised and concerned that MEDIC would not transfer her to another work partner so she would be safe and avoid harassment. She said that when her male partner asked to be transferred, his request was granted, and he was allowed to choose his new shift and new partner. This employee felt she was being discriminated and retaliated against based on gender, for sharing her concerns of harassment, and that MEDIC tried to make it her problem rather than work with her to resolve the problem. Plaintiff also reported this to HR.

99. Later that day, Plaintiff met with Taulbert and Staley. Staley admitted to Plaintiff that they had not handled the situation well, that they were in "new territory." They informed Plaintiff that their investigation was complete and that they did not find any "smoking guns" indicating discrimination, harassment, or hostile work environment. This was extremely troubling for Plaintiff since, at the beginning of the investigation, they told Plaintiff there was evidence of discrimination, harassment, retaliation, and a culture of fear and retaliation.

100. Staley and Taulbert informed Plaintiff that a conflict resolution counselor would be brought in to work with Plaintiff and Keith. When Plaintiff expressed her increased concerns of retaliation as the situation escalated, she was again told that her only two options were to either stay home or go on involuntary administrative leave. Plaintiff emailed Staley on or about March 4, 2015 to confirm that she was not comfortable with either of those two options.

101. After this, Taulbert also became more aggressive and negative toward Plaintiff. Staley began to disengage with Plaintiff and distanced himself from the issues. Plaintiff's efforts

19

at work continued to be undermined by her male peers (Bryan Edwards and Studnek) ,and by male members of the Executive Leadership Team (Keith and Penner).

102. Plaintiff was subjected to retaliation and a hostile work environment, and felt beaten down and isolated by MEDIC.

103. On March 10, 2015, Plaintiff, by and through a letter from the undersigned counsel addressed to Penner, Keith, Staley and MEDIC, objected to the pervasive and widespread discriminatory attitudes and practices at MEDIC and to the acts of retaliation against Plaintiff which contributed to and created and hostile work environment.

104. On March 16, 2015, Plaintiff was suddenly and without notice called into an impromptu meeting with Taulbert, Penner, and Keith, and was told to sign an agreement. Plaintiff told Penner she needed to read and understand the agreement before signing, but Penner threatened her job, stating he was confused about why she would not sign on the spot since he was "under the impression [Plaintiff] wanted [her] job." Plaintiff was repeatedly instructed by MEDIC to sign statements that asserted facts that were not true about her work environment. These actions were threatening, harassing, and retaliatory.

105. Upon Plaintiff's return to the office, Taulbert tried to force Plaintiff into an unscheduled meeting with MEDIC's attorney, Pat Kelly, even though Taulbert knew Plaintiff had retained her own attorney because of their retaliation and discrimination against her. MEDIC led Plaintiff to believe her attorney had told them it was okay for them to meet with her that day, without her attorney's presence, but Plaintiff later learned this was not the case.

106. On March 20, 2015, Plaintiff was required to attend an "interview" with MEDIC's legal counsel, Pat Kelly. Upon information and belief, the interview was conducted as an interrogation intended to find reasons to remove Plaintiff from the workplace. The attorney told

20

Plaintiff he was going to listen to the recording he made of the interview to justify requiring her to go on a mandatory leave of absence.

107.     That day, Keith usurped Plaintiff's duties by sending out an agency-wide email himself rather than giving her the green light to send it. Plaintiff emailed Keith and Taulbert asking why her work was taken away, but neither responded.

108.     On March 23, 2015, Plaintiff met with Taulbert to find out why she did not receive an answer about why her work was taken away, but Taulbert did not respond to that question. Plaintiff also voiced her concerns about how hostilely she was treated by MEDIC's attorney and how it appeared MEDIC was trying to shut down her complaints and intimidate her and others rather than resolve the issues.  Taulbert claimed she was trying to defend Plaintiff but that Taulbert's own job was on the line.

109.     On March 24, 2015, Keith continued to usurp Plaintiff's duties by scheduling a meeting to take place when, upon information and belief, he knew that she was scheduled to be out of the office.

110.     As a result of the discriminatory and retaliatory actions taken by MEDIC against Plaintiff based on her gender and protected activity of opposing unlawful employment discrimination against females and minorities, Plaintiff had to take time off for medical reasons.

111.     On March 30, 2015, Taulbert and Staley had another meeting with Plaintiff and insisted that she sign another document requiring her to report any issues that she was experiencing. The document further required her to attest to her "trust" in Penner. Plaintiff asked Taulbert why Keith undermined her by sending the March 20th email that she was supposed to send to the agency. Taulbert said she asked Keith about it and he said that "he just felt like sending it."

21

112.    On March 31, 2015, Plaintiff documented the events of March 20, 2015, pursuant to the instructions she received the previous day.

113.    On April 1, 2015, Plaintiff was subjected to discipline when she was placed on an involuntary administrative leave and was not allowed to return to the workplace since that day. MEDIC admitted that Plaintiff made formal complaints of retaliation and cited her complaints of harassment, discrimination, and retaliation as the reasons for placing her on involuntary administrative leave in a letter from Staley to Plaintiff dated April 1, 2015.

114.    Upon information and belief, when employees and community members who interacted with Plaintiff as part of her job inquired about her, MEDIC was not honest with them and did not inform the people who needed to know that she was not working.

115.    MEDIC instructed Plaintiff not to communicate with anyone at MEDIC or with any of her external contacts about her absence, or at all during her absence. MEDIC instructed Plaintiff not to respond to any of her work emails or to any text messages received on her work phone, but did not immediately suspend access to either. As a result, Plaintiff was able to see that her colleagues, both internally and externally, were becoming confused and frustrated with her because they did not know why she was not responding to them or communicating with them.

116.    Upon information and belief, MEDIC left Plaintiff's phone calls and emails unanswered, intending to damage Plaintiff's professional reputation and integrity.

117.    On April 10, 2015, MEDIC's attorney, Taulbert, Keith, Staley, Plaintiff, and Plaintiff's attorney participated in a session with a facilitator chosen by MEDIC's attorney. MEDIC demanded Plaintiff sign an agreement that contained false statements and went far beyond what was agreed to at the mediation. MEDIC would not allow Plaintiff to return to work.

22

118.    MEDIC claimed Plaintiff said she felt "physically" unsafe at work to justify not allowing her to return to work, although Plaintiff and her counsel made it clear that Plaintiff felt no one was protecting her from retaliation, and she felt unsafe in terms of the lack of protection from retaliation.

119.    On May 7, 2015, Plaintiff was terminated from her position at MEDIC. The termination letter was signed by Penner, who cited Plaintiff's complaints of sex and race discrimination, hostile work environment, and retaliation as a primary reason for termination. For example, the letter states, "There was no way that Medic could place you back in the workplace as long as you continued to believe, or at least claim to believe, that you felt unsafe and lacked confidence that any person could or would protect you from retaliation."

120.    The termination letter further cites Plaintiff's attorney's representation of her as a primary reason for her termination. "The narrative you and your attorney have put forward about Medic [sic] having systemic and far-reaching problems with race, color, and gender issues is simply not based in reality."

121.    MEDIC's termination letter mischaracterized Plaintiff's complaints of discrimination, harassment, and retaliation as being insubordination. MEDIC further claimed that Plaintiff's requests for protection from retaliation and for corrective action to resolve the problems were "unreasonable and unattainable."

122.    MEDIC's termination letter further incorrectly claimed that Plaintiff's communications were divisive, and that she did not follow applicable policies and procedures for reporting the issues, which upon information and belief, MEDIC knew was untrue.

123.    Indeed, Plaintiff properly and in good faith reported the issues of discrimination, hostile work environment, harassment, and retaliation, and Plaintiff cooperated in all

23

investigations conducted by MEDIC, despite those investigations being poorly managed, unnecessarily hostile, and ultimately ineffectual.

124. MEDIC's termination letter admits that Plaintiff was terminated as a direct and proximate result of her protected activity.

125. To the extent that MEDIC, by its termination letter or otherwise, presents facially legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, those reasons are pretexts for the true, unlawful reasons.

126. Plaintiff appealed her termination to the Agency Management Committee. On June 1, 2015, the Agency Management Committee upheld the termination.

127. MEDIC's decision to terminate Plaintiff had a significant negative impact on her. The loss of her income placed a tremendous strain on her personally. Plaintiff's household depended heavily on Plaintiff's income to meet its obligations. Plaintiff was forced to purchase health insurance for herself and her daughter at a steep cost during the months in which she was out of work.

128. After several months of job searching, Plaintiff accepted an offer which only paid about 1/3 of what her salary had been at MEDIC. The wrongful termination and resulting financial pressures weighed heavily on Plaintiff and caused anxiety, depression, difficulty sleeping, and other related symptoms.

## COUNT I
### (Title VII, 42 U.S.C. § 2000e, *et seq.* – Sex Discrimination, Wrongful Termination, Hostile Work Environment, and Retaliation)

129. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

130. MEDIC regularly employed more than fifteen (15) employees at all relevant times.

24

131.    Plaintiff is a female, and is thus a member of a protected class based on her sex.

132.    MEDIC, through its agents, employees, and supervisors, engaged in unlawful discrimination against Plaintiff on the basis of her sex.

133.    MEDIC subjected Plaintiff to retaliation and a hostile work environment by forcing her to work from home and eventually placing her on involuntary administrative leave because she was a female who engaged in legally protected activity and complained to HR Manager Taulbert, Deputy Director Staley, and twelve (12) other managers about discrimination on the basis of race, color, national origin, and sex, each in violation of Title VII.

134.    MEDIC further retaliated against Plaintiff by terminating her on the basis of her sex and for engaging in the legally protected activity of opposing unlawful discrimination of other employees on the basis of their race, color, national origin, and sex, each in violation of Title VII; for reporting a hostile work environment and retaliation on the basis of her complaints; for reporting sexual harassment committed against other female employees; and for hiring an attorney to assist her with her complaints of discrimination, retaliation, and hostile work environment. Even after MEDIC was on notice of these issues, MEDIC continued to harass and retaliate against Plaintiff, and failed to take corrective action.

135.    MEDIC violated Title VII by treating Plaintiff differently than her similarly situated male peers in the terms and conditions of her employment.

136.    MEDIC had knowledge of and ratified the acts of unlawful race, color, national origin, and sex discrimination committed by Keith and Penner, and failed to take corrective action to remedy the hostile work environment and retaliation MEDIC inflicted upon Plaintiff, Hispanic/Latin employees, black employees, and other female employees.

25

137.    Keith and Penner's discriminatory conduct followed by HR Manager Taulbert and Deputy Director Staley's conduct in ignoring and perpetuating sex discrimination, a hostile work environment, and retaliation was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment, and created a hostile or abusive work environment on the basis of Plaintiff's sex and her complaints of race, color, national origin, and sex discrimination.

138.    Plaintiff subjectively perceived the discrimination and hostile work environment wrought upon her and other females as severe and pervasive.

139.    A reasonable female in Plaintiff's circumstances would consider the working environment to be objectively abusive or hostile.

140.    MEDIC retaliated against Plaintiff shortly after she engaged in legally protected activities, i.e., for her reporting of Keith and Penner's discrimination, requesting corrective action numerous times, opposing unlawful discrimination in the workplace, complaining of retaliation, and hiring an attorney to assist her with her complaints after MEDIC failed to take corrective action.

141.    MEDIC terminated Plaintiff shortly after she engaged in these legally protected activities.

142.    A causal connection exists between Plaintiff's complaints of discrimination and the adverse actions taken against her, e.g., forcing Plaintiff to work from home, forcing her to go on involuntary administrative leave, excluding her from meetings, usurping her job duties, and ultimately terminating her.

143.    As a direct and proximate result of this sex-selective and targeted discrimination, Plaintiff was disciplined and terminated because of her sex and because of her complaints about discrimination, harassment, and retaliation.

26

144.     MEDIC's termination letter to Plaintiff expressly states that her complaints of discrimination, harassment, hostile work environment, and retaliation were the reason for her termination, which serves as direct evidence of sex discrimination and retaliation in violation of Title VII.

145.     Keith admitted to unlawful discrimination by his statement to Plaintiff and four other women including one black female that "I am either sexist or racist; I'll let you figure out which one, I'm not going to change." MEDIC's HR Department and members of the Executive Leadership Team had knowledge of Keith's statement and ratified his statement by failing to take corrective action.

146.     Had Plaintiff not complained of race, color, national origin, and sex discrimination, hostile work environment, and retaliation as described herein or had she not objected to these unlawful employment practices against herself and others, she would not have been terminated.

147.     To the extent that MEDIC purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are her legally protected activities as described herein.

148.     MEDIC's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination, retaliation, and hostile work environment. As a direct and proximate result of MEDIC's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

149.     As a result, Plaintiff is entitled to recover from MEDIC damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including

27

consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action.

## COUNT II
### (Wrongful Discharge in Violation of Public Policy Based on Gender/Biological Sex— North Carolina Equal Employment Practices Act N.C. Gen. Stat. § 143-422.1, *et. seq.*)

150.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

151.    The public policy of the State of North Carolina, as set forth in N.C.G.S. § 143-422.2(a), North Carolina's Equal Employment Practices Act ("NCEEPA"), prohibits employers from discriminating against employees on the basis of their gender/biological sex.

152.    Keith admitted to unlawful discrimination by his statement to Plaintiff and four other women including one black female that "I am either sexist or racist; I'll let you figure out which one, I'm not going to change." MEDIC's HR Department and members of the Executive Leadership Team had knowledge of Keith's statement and ratified his statement by failing to take corrective action.

153.    MEDIC violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 by terminating Plaintiff on the basis of her gender/biological sex.

154.    MEDIC discriminated against and terminated Plaintiff because she is female, and because she complained about MEDIC's discriminatory employment practices against other employees on the basis of race, color, national origin, and gender/biological sex.

155.    As a result of this sex-selective and targeted discrimination, Plaintiff was disciplined and terminated because of her gender/biological sex.

28

156. MEDIC terminated Plaintiff based on her gender/biological sex, which is an unlawful reason or purpose that contravenes this public policy.

157. Plaintiff's gender/biological sex was a substantial factor in MEDIC's decision to terminate Plaintiff.

158. MEDIC's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination. As a direct and proximate result of MEDIC's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

159. As a result, Plaintiff is entitled to recover from MEDIC damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action.

## COUNT III
**(Wrongful Discharge in Violation of Public Policy Based on Plaintiff's Refusal to Participate in Unlawful Discrimination on the Basis of Race, Color, or National Origin — North Carolina Equal Employment Practices Act N.C. Gen. Stat. § 143-422.1, *et. seq.*)**

160. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

161. The public policy of the State of North Carolina, as set forth in N.C.G.S. § 143-422.2(a), North Carolina's Equal Employment Practices Act ("NCEEPA"), prohibits employers from discriminating against employees on the basis of their race, color, national origin, and biological sex.

29

162.     After Plaintiff advocated for Oliva's employment opportunity to attend Leadership Charlotte at MEDIC's expense as it had done for other white male employees, Penner expressed the view to Plaintiff that Oliva was not the "right kind of employee" to represent MEDIC in Leadership Charlotte even though Oliva was willing to participate at his own expense and offered to use his vacation time. Plaintiff understood this reference about Oliva not being the "right kind of employee" to refer to his race, color, and national origin.

163.     Keith then directed Plaintiff to prevent Oliva from applying to attend Leadership Charlotte on his own. Prior to this directive, Keith told Plaintiff, and four other women including one black female that "I am either sexist or racist; I'll let you figure out which one, I'm not going to change." Based on Keith's and Penner's conduct, Plaintiff understood the directive to prevent Oliva from applying to participate in Leadership Charlotte to be based on his race, color, and national origin, which would be unlawful discrimination in violation of North Carolina public policy as set forth in N.C.G.S. § 143-422.2(a), NCEEPA.

164.     Plaintiff refused to participate in unlawful conduct or conduct which violated North Carolina public policy, as set forth in N.C.G.S. § 143-422.2(a), NCEEPA, when she advocated for Oliva and refused to follow Keith's directive to prevent Oliva from applying to participate in Leadership Charlotte, an employment opportunity.

165.     MEDIC violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 by terminating Plaintiff because she refused to participate in unlawful, discriminatory conduct.

166.     MEDIC terminated Plaintiff for an unlawful reason or purpose that contravenes this public policy.

167. Plaintiff's refusal to participate in unlawful conduct or conduct which violated North Carolina public policy, as set forth in N.C.G.S. § 143-422.2(a), NCEEPA, was a substantial factor in MEDIC's decision to terminate Plaintiff.

168. MEDIC's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination.

169. As a direct and proximate result of MEDIC's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

170. As a result, Plaintiff is entitled to recover from MEDIC damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1. Pursuant to Count I (Title VII, 42 U.S.C. § 2000e et seq. – Gender Discrimination, Wrongful Termination, Hostile Work Environment, and Retaliation against MEDIC), that Plaintiff have and recover damages in an amount to be proven at trial, including compensatory, and consequential damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action;

2. Pursuant to Count II (Wrongful Discharge in Violation of Public Policy Based on Gender/Biological Sex – the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. §

31

143-422.1, et. seq.), that Plaintiff have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action;

3.      Pursuant to Count III (Wrongful Discharge in Violation of Public Policy Based on Plaintiff's Refusal to Participate in Unlawful Discrimination on the Basis of Race, Color, or National Origin — North Carolina Equal Employment Practices Act N.C. Gen. Stat. § 143-422.1, *et. seq.*), that Plaintiff have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action

4.      That this matter be tried by a jury; and

5.      That the Court grant such other and further relief as this Court may deem just, proper, and equitable.

Respectfully submitted, this the 19th day of April, 2017.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar 13253
1824 E. Seventh Street
Charlotte, NC 28201
mmaloney@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorney for Plaintiff*

32

# STATE OF NORTH CAROLINA

File No.

17-CVS-6054

MECKLENBURG County

In The General Court Of Justice
☐ District ☒ Superior Court Division

**Name Of Plaintiff**
TARA RAGAN

2017 MAR 30 P 3:08

**VERSUS**

**Name Of Defendant**
MECKLENBURG EMS AGENCY d/b/a MEDIC

**APPLICATION AND ORDER
EXTENDING TIME TO
FILE COMPLAINT**

G.S. 1A-1, Rule 3

---

**APPLICATION**

The undersigned requests permission to file a complaint in this action within twenty (20) days of any order granting this Application, as provided in Rule 3 of the Rules of Civil Procedure. The nature and purpose of the action are:

**Name And Purpose Of The Action**

COMPLAINT FOR:
(1) VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AS AMENDED (42 U.S.C. SECTIONS 2000e et seq.);
(2) WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY SET FORTH IN THE NORTH CAROLINA EQUAL EMPLOYMENT PRACTICES ACT (N.C. Gen. Stat. 143-422.1 et seq.);
(3) NEGLIGENT RETENTION;
(4) NEGLIGENT SUPERVISION;
(5) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; and
(6) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Date**
03-30-2017

**Signature**

☐ Applicant
☒ Attorney For Applicant

---

**ORDER**

The Court states that the nature and purpose of this action are as set forth above.

Therefore, it is ORDERED that permission is granted to the applicant to file a complaint in this action up to and including the date shown below.

**File Complaint On Or Before**
04-19-2017

*(Date must be within 20 days of date of Order.)*

**Date Of Order**

3/30/17

Signature

☒ Assistant Clerk Of Superior Court    ☐ Clerk Of Superior Court

---

**NOTE:** *Under Rule 3 of the Rules of Civil Procedure, upon entry of this Order, a summons shall be issued and the summons and a copy of this Order must be served in accordance with the provisions of Rule 4. A complaint must be filed in this action within the period provided above and that complaint must be served in accordance with the provisions of Rule 4 or by registered mail if the plaintiff so elects. If a complaint is not filed within the above period, the action shall abate.*

AOC-CV-101, Rev. 7/11
© 2011 Administrative Office of the Courts

*(Over)*

Case 3:17-cv-00489-RJC-DCK    Document 1-2    Filed 08/15/17    Page 34 of 37

## STATE OF NORTH CAROLINA

MECKLEBURG County

File No.

17-CVS-
6054

Film No.

In The General Court Of Justice
☐ District ☒ Superior Court Division

**Name Of Plaintiff**

TARA RAGAN

**VERSUS**

**Name Of Defendant(s)**

MECKLENBURG EMS AGENCY d/b/a MEDIC

## CIVIL SUMMONS
## TO BE SERVED WITH
## ORDER EXTENDING
## TIME TO FILE COMPLAINT

G.S. 1A-1, Rule 4

| TO: | TO: |
|---|---|
| **Name And Address Of Defendant 1** | **Name And Address Of Defendant 2** |
| MECKLENBURG EMS AGENCY d/b/a MEDIC 4525 STATESVILLE ROAD | |
| CHARLOTTE          NC   28269 | |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served with the complaint as authorized in the attached order. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date 3/30/17 | Time 3⋅08 | ☐ AM ☒ PM |
|---|---|---|---|
| MARGARET B. MALONEY MALONEY LAW & ASSOCIATES PLLC 1824 EAST SEVENTH STREET CHARLOTTE          NC   28204 | Signature ☐ Deputy CSC        ☐ Assistant CSC | | Clerk Of Superior Court |

AOC-CV-102, Rev. 3/98
© 1998 Administrative Office of the Courts

(Over)

| RETURN OF SERVICE | |
|---|---|

I certify that this Summons and a copy of the Order were received and served as follows:

## DEFENDANT 1

| Date Served | Name Of Defendant |
|---|---|
| | |

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Signature |
|---|---|
| | |

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Name Of Defendant |
|---|---|
| | |

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Signature |
|---|---|
| | |

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Date Received | Name Of Sheriff |
|---|---|---|
| $ | | |
| Paid By | Date Of Return | County |
| | | Deputy Sheriff Making Return |

AOC-CV-102, Side Two, Rev. 3/98
© 1998 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____MECKLENBURG_____ County

File No.

17-CVS-6054

Film No.

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| Name Of Plaintiff |
| --- |

TARA RAGAN

**VERSUS**

| Name Of Defendant |
| --- |

MECKLENBURG EMS AGENCY d/b/a MEDIC

**DELAYED SERVICE**

**OF**

**COMPLAINT**

G.S. 1A-1, Rules 3 & 4

| TO: | TO: |
| --- | --- |
| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| MECKLENBURG EMS AGENCY d/b/a MEDIC<br>4525 STATESVILLE ROAD<br>CHARLOTTE, NC 28269 | |

You are being served with a copy of the complaint in this action, the delayed filing of which was ordered when the summons was issued. You must:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date | Time | ☐ AM |
| --- | --- | --- | --- |
| MARGARET B. MALONEY | | | ☐ PM |
| MALONEY LAW & ASSOCIATES PLLC | Signature | | |
| 1824 EAST SEVENTH STREET | | | |
| CHARLOTTE          NC  28204 | ☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court | | |

AOC-CV-103, Rev. 3/98
© 1998 Administrative Office of the Courts

Original File    Copy-Each Defendant    Copy-Attorney/Plaintiff
(Over)